```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

                -against-

MALIK MCCOLLUM,

                              Defendant.
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/2022

21 Cr. 733 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Defendant, Malik McCollum, charged with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2, *see* ECF No. 2, moves to suppress statements he made to the police during one of two interviews following his arrest. ECF No. 19. On June 28, 2022, the Court held an evidentiary hearing to resolve factual issues, including the question of the sequence of the interviews. *See* Dkt. Entry 6/28/2022. Police Officers Rashard Jones and Sanjay Gidarisingh testified for the Government. Tr. at 5, 27, ECF No. 37. Defendant called Detective Jordan Abidin. *Id*. at 55. The Court credits their testimony to the extent it concords with the Court's conclusions with respect to the timing of the interviews. And, for the reasons stated below, Defendant's motion is DENIED.

## BACKGROUND

On July 30, 2021, at 2:19 a.m., Defendant was arrested in the Bronx by Officer Rashard Jones and accused of unlawfully possessing a firearm. *See* Tr. at 7, 14. Defendant was transported to the 40th Precinct and placed in a holding cell. *See id*. at 7–8. After waiting for the evidence collection team at the scene for "a couple [of] hours," Jones returned to the station house and sat in a room near the holding cell, where he completed paperwork and was available to respond if Defendant needed assistance. *Id*. at 7–8, 25.

The parties dispute what happened after Defendant arrived at the precinct. According to the Government, Jones escorted Defendant to the precinct's detective squad around 12:20 p.m., where Defendant was read his *Miranda* rights by Detective Mariusz Jasiurkowski and questioned by him and another detective in a recorded interview. *Id*. at 9–11; Recording at 6:50, ECF No. 19-2; Gov. Mem. at 2, ECF No. 40. During the interview with Jasiurkowski, Defendant made certain statements that the Government intends to use at trial. *See* Gov. Mem. at 2; *see also*, *e.g.*, Recording at 18:40, 22:40–23:10. After that interview, Jones escorted Defendant to the Field Intelligence Office ("FIO"), where Defendant was interviewed for a second time by Officer Sanjay Gidarisingh and Detective Jordan Abidin who work for the FIO. Tr. at 12, 24, 32–33; Gov. Mem. at 2. In the second interview, Defendant refused to answer questions. Tr. at 34; Gov Mem. at 2–3.

Defendant claims that, after being brought to the precinct, he was kept in a holding cell without access to food, water, or a toilet. Tr. at 18–19, Def. Mem. at 2, ECF No. 39. First, he was questioned by three FIO officers in an unrecorded interview about his knowledge of criminal activity in the city. Def. Mem. at 2; Affirmation ¶¶ 4–5, ECF No. 19-1. Defendant was not read his *Miranda* rights during this interview. Tr. at 30; Def. Mem. at 3; Affirmation ¶ 5. Then, around 12:20 p.m., Defendant was questioned by Jasiurkowski about the charged offense. Tr. 18; Recording at 4:57–27:37. Around 12:46 p.m., a different detective asked Defendant whether he could provide information about any criminal activity. Recording at 28:09–32:17; Def. Mem. at 3.

On December 2, 2021, Defendant was indicted on the instant offense. ECF No. 2. On April 5, 2022, Defendant moved to suppress his post-arrest statements and included with his motion an affirmation in which he alleges that the interview with the FIO officers (the "Unrecorded

Interview") occurred before his interview with the detective squad (the "Recorded Interview"). Affirmation ¶¶ 3–6. On June 28, 2022, the Court held a hearing primarily to resolve whether the Unrecorded Interview occurred before the Recorded Interview. *See* Dkt. Entry 6/28/2022; Tr. at 3–5. The Government called two witnesses, Jones and Gidarisingh, who testified that the Unrecorded Interview occurred after the Recorded Interview. *See* Tr. at 10–12, 24, 33, 39, 50. Defendant called Abidin who did not remember when the Unrecorded Interview occurred. *Id*. at 72–73.

## DISCUSSION

I. Legal Standard

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the government may not use custodial statements against a defendant unless the defendant had "sufficient knowledge of his or her constitutional rights relating to the interrogation and . . . any waiver of such rights [wa]s knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007) (discussing *Miranda*, 384 U.S. at 444–45). Therefore, what a suspect says during a custodial interrogation cannot be used at trial unless the prosecution can establish by a "preponderance of the evidence" that the accused "in fact knowingly and voluntarily waived his [*Miranda*] rights when making the statement." *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (quotation marks and citation omitted). Waivers are considered "voluntary" when they are "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. (quotation marks and citation omitted). And, they are considered "knowing" when they are "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. (emphasis, quotation marks, and citation omitted). Courts assessing whether statements are admissible must consider "the totality of circumstances surrounding a

*Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014).

When assessing a situation in which a defendant made an admission after a *Miranda* warning, but this admission was preceded by earlier, unwarned incriminating statements, courts "must suppress a postwarning statement if the suspect demonstrates that his statement was involuntary despite the *Miranda* warning." *Carter*, 489 F.3d at 534 (discussing *Oregon v. Elstad*, 470 U.S. 298 (1985)). But, when "a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession," courts must instead assess whether the *Miranda* warning given was effective in light of the prior interrogation. *Id*. at 534–35 (discussing *Missouri v. Seibert*, 542 U.S. 600 (2004)). The government bears the "burden of disproving the deliberate use of a two-step interrogation technique by a preponderance of the evidence." *United States v. Capers*, 627 F.3d 470, 480 (2d Cir. 2010). And, courts assessing whether the government used such a technique "should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness." *Id*. at 479. This assessment may involve considerations of the following factors: (1) "the completeness and detail of the questions and answers in the first round of interrogation"; (2) "the overlapping content of the two statements"; (3) "the timing and setting of the first and the second [interrogations]"; (4) "the continuity of police personnel"; and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *United States v. Pritchette*, 219 F. Supp. 3d 379, 384 (S.D.N.Y. 2016) (quoting *Seibert*, 542 U.S. at 615); *see also United States v. Moore*, 670 F.3d 222, 229 (2d Cir. 2012).

II. <u>Application</u>

Defendant seeks to suppress his post-arrest statements, arguing that any waiver of his *Miranda* rights was not knowing and voluntary because: (1) the earlier un-*Mirandized*

4

interrogation during the Unrecorded Interview tainted the waiver at the Recorded Interview, and, in the alternative, (2) the waiver at the Recorded Interview was not knowing and voluntary even if it preceded the un-*Mirandized* interrogation during the Unrecorded Interview.  *See generally* Def. Mem.  The Government argues that the statements Defendant made to Jasiurkowski after Jasiurkowski read Defendant the *Miranda* warning at the Recorded Interview should not be suppressed because Defendant's waiver was knowing and voluntary.  *See generally* Gov. Mem.

First, the Court concludes that the Government has proven by a preponderance of the evidence that the Recorded Interview preceded the Unrecorded Interview, and that, therefore, the un-*Mirandized* interrogation at the Unrecorded Interview did not taint the waiver at the Recorded Interview with Jasiurkowski.  At the hearing, Jones testified that he arrested Defendant at 2:19 a.m., and, from approximately two hours after the arrest[1] to 12:20 p.m., sat near Defendant's holding cell.  *See* Tr. at 7–8, 17.  Jones stated that he escorted Defendant to both interviews, and that the Recorded Interview, which involved interrogations conducted by two different officers from the detective squad, occurred prior to the Unrecorded Interview with the FIO.  *See id*. at 9–12; *see generally* Recording.  And, Jones said he was present for the first part of the Recorded Interview, when Defendant was read his *Miranda* rights by Jasiurkowski.  *See* Tr. at 10–11.  The video footage confirms that, at the Recorded Interview, Defendant was interviewed by Jasiurkowski after being read his *Miranda* rights.  *See* Recording at 6:50.

Gidarisingh's hearing testimony corroborated Jones' statements.  He testified that "[a]s a practice," the interview with the officers from the detective squad "always takes place prior to a prisoner debriefing" with the FIO.  Tr. at 32, 50.  Gidarisingh also testified that Jones brought Defendant to the Unrecorded Interview, and that prior to bringing in Defendant, Jones said that

---

[1] Although Jones testified that he did not remember exactly when he arrived at the precinct, he also testified that the longest he ever waited at a crime scene was two hours.  *See* Tr. at 7.

5

Defendant was "finishing up with the detective squad"—namely Jasiurkowski and the other detective. *Id*. at 39. Abidin, who interviewed Defendant with Gidarisingh, stated that he typically works from 4:00 p.m. to 12:00 a.m., *id*. at 73, which further supports the Government's claim that the Unrecorded Interview occurred after the Recorded Interview.

The Court acknowledges that there is evidence contradicting or calling into question the witnesses' testimony. Defendant's affirmation states that in the morning after his arrest he was first taken to an interrogation room where he was questioned by three officers about "other people" without being read his *Miranda* rights. Affirmation ¶¶ 3–5. Then, he claims he was taken to a different interrogation room and questioned by two different officers. *Id*. ¶ 6. Moreover, at the hearing, Jones could not recall exactly when he arrived at the precinct, which allows for the possibility that an interview occurred before his arrival. Tr. at 7, 25. Additionally, the entry log created by Gidarisingh after the Unrecorded Interview does not state the time when the interview took place despite including all other relevant information. *Id*. at 35, 52–53. And, although Abidin testified that there was a third FIO officer present during the Unrecorded Interview, Gidarisingh could not recall if there was a third officer present. *Id*. at 45–46, 57.

After considering all of the evidence presented by both parties, the Court concludes that the Government has shown by a preponderance of the evidence that the Recorded Interview preceded the Unrecorded Interview. Jones and Gidarisingh testified that the Recorded Interview occurred before the Unrecorded Interview, and Abidin testified that, although he did not remember when the Unrecorded Interview occurred, he typically did not start work until 4:00 p.m., which was after the Recorded Interview took place. *See* Tr. at 9–12, 39, 75. Considering the totality of the evidence, the Court credits the witnesses' testimony. *See, e.g.*, *United States v. Frank*, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) (finding the testimony of law enforcement witnesses more

6

credible than a defendant's affidavit when the witnesses testified under oath at a hearing, appeared "forthright and truthful," and were subject to cross-examination, and the defendant provided an affidavit but did not testify at a hearing).

Additionally, the Court concludes that the Government has shown by a preponderance of the evidence that Defendant was read his *Miranda* rights at the Recorded Interview during his conversation with Jasiurkowski, and knowingly and voluntarily waived those rights. Before reading the *Miranda* warning, Jasiurkowski, the first detective who spoke with Defendant, stated "I'm going to read you these warnings. I just need you to acknowledge that you understand what I'm reading to you. Just respond 'yes' or, you know, 'no.'" Recording at 6:37–6:50. Jasiurkowski then informed Defendant that (1) he has the "right to remain silent," (2) "[a]nything [he does] or [says] may be used against [him] in a court of law," (3) he has "the right to consult an attorney before speaking to the police and to have an attorney present during any questioning now or in the future," and (4) "if [he] do[es] not have an attorney available, [he] h[as] the right to remain silent until [he] [has] the opportunity to consult with one." *Id*. at 6:50–7:30. After each statement, Jasiurkowski asked Defendant "Do you understand?" and Defendant answered "Yes." *Id*. Then, Jasiurkowski asked, "Now that I have advised you of your rights, are you willing to answer questions?" *Id*. Defendant responded that it "[d]epends on the questions." *Id*. The video footage shows that Defendant was apprised of his *Miranda* rights, waived those rights, and chose to answer questions with knowledge of the potential consequences. The video of the remainder of this interview depicts Defendant coherently and alertly responding to Jasiurkowski's questions about the circumstances of the charged offense. *Id*. at 7:30–27:37.

Defendant argues that his waiver was not knowing and voluntary because he was "tired, hungry, thirsty, and hungover." Affirmation ¶ 4. He also states that, during the Recorded

7

Interview, he "did not understand why [he] was being interrogated for a second time and [he] did not understand that [he] had the right to have an attorney present with [him] in that room at that time." *Id*. ¶ 6.

First, Defendant's claims of discomfort do not overcome the video evidence showing that he was read his *Miranda* rights, understood them, and chose to relinquish them without any coercion. *See O'Brien*, 926 F.3d at 73. Defendant does not argue that the police intentionally created his uncomfortable conditions "so that he would be more easily manipulated into confessing," *Maldonado v. Greiner*, No. 01 Civ. 799, 2003 WL 22435713, at *37 (S.D.N.Y. Oct. 28, 2003), nor does he contend that he complained about the conditions of his interrogation, *id*. at 38 n.62; *see also United States v. Cooper*, No. 19 Cr. 159, 2019 WL 4346263, at *4 (E.D.N.Y. Sept. 12, 2019). Additionally, the Court has found that Defendant was read his *Miranda* rights at his first interview, and, therefore, does not credit Defendant's claim that he was confused.

Moreover, the Court finds that it would adhere to its conclusion regarding Defendant's waiver of his *Miranda* rights even if the Unrecorded Interview preceded the Recorded Interview. First, the Government has shown by a preponderance of the evidence that the police did not employ "a deliberate, two-step strategy . . . to obtain the postwarning" statements. *Carter*, 489 F.3d at 535. Defendant's affirmation, the hearing testimony, and video recording, demonstrate that the Unrecorded Interview and the first part of the Recorded Interview concerned different types of questioning by different departments within the precinct—with the former conducted by the FIO and targeted towards potential crimes committed by others, and the latter conducted by the detective squad and focused on the charged offense. *See* Affirmation ¶ 5; Tr. at 29–30, 33–34. It is also undisputed that Defendant did not answer any questions at the Unrecorded Interview. *See* Affirmation ¶ 5; Tr. at 33–34. And, although Jones was present for at least part of both interviews,

he did not participate in either interview in any material way. *See* Tr. at 11, 13. Thus, the Court concludes that the Government has shown by a preponderance of the evidence that it did not deliberately employ a two-step interrogation technique. *See Pritchette*, 219 F. Supp. 3d at 384.

Additionally, the Court finds that had the Unrecorded Interview occurred first, that would not have rendered Defendant's statements at the Recorded Interview "involuntary despite the *Miranda* warning." *Carter*, 489 F.3d at 534. Even if the Court were to credit Defendant's version of events, had detectives at the Unrecorded Interview stated that they could make his case "disappear" if he cooperated with their questioning regarding "other people," Affirmation ¶ 5, it does not follow that statements made at a later interrogation, on a different topic, to a different officer, were rendered involuntary. *Cf. Taylor*, 745 F.3d at 23. And, Defendant's statement that he "did not understand why [he] was being interrogated for a second time and [he] did not understand that [he] had a right to have an attorney present with [him] in that room at that time," Affirmation ¶ 6, does not raise sufficient questions regarding Defendant's knowledge of his rights in light of the video evidence.

Accordingly, Defendant's motion to suppress his post-arrest statements is DENIED to the extent it concerns statements made to Jasiurkowski at the Recorded Interview.

## CONCLUSION

For the reasons stated above, Defendant's motion to suppress his post-arrest statements is DENIED to the extent it concerns statements made to Jasiurkowski at the Recorded Interview.

SO ORDERED.

Dated: September 30, 2022
New York, New York

_____
ANALISA TORRES
United States District Judge